Arthur LISAK, Plaintiff–Appellant,

v.

MERCANTILE BANCORP, INC., et al.,
Defendants–Appellees.

No. 86–3126.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 3, 1987.
Decided Nov. 25, 1987.

Nicholas T. Kistos, Chicago, Ill., for plaintiff-appellant.

Ronald N. Heftman, Martin, Craig, Chester & Sonnenschein, Chicago, Ill., Carl N. Carpenter, Galvin, Galvin & Leeney, Hammond, Ind., for defendants-appellees.

Before BAUER, Chief Judge, and POSNER and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

The Superior Court of Lake County, Indiana, issued a decree of divorce between Arthur Lisak and Augusta Lisak in 1974. The decree ordered Arthur to pay $355,000 to Augusta. In 1976 Arthur, then (as now) a resident of Texas, visited Indiana; Augusta, contending that Arthur had not paid the 1974 judgment, obtained a bench warrant for his arrest. After a week in jail focused his mind, Arthur agreed to establish a trust worth $95,000 in settlement of the dispute. Augusta would be entitled to $600 per month and could invade principal for necessaries; Arthur would have a reversionary interest if more than $20,000 remained at Augusta's death. Arthur

signed a settlement agreement, deposited with the court assets worth about $20,000, and was released from jail. A month later he ponied up $80,000 in cash. He steadfastly declined to sign the instrument creating the trust, contending that he had been coerced into the settlement and that the trust instrument supplemented its terms.

The settlement provided that "in the absence of agreement as to such further provisions ... the matter will be submitted to the Judge then sitting in Lake Superior Court, Room Number One, who shall make said decision, and the decision of said Judge shall be final and without recourse by either of the parties hereto." Augusta asked the Superior Court to approve the terms of the trust despite Arthur's recalcitrance. The court did so and appointed a commissioner to execute the instrument on Arthur's behalf. The commissioner signed on May 26, 1977, and the trust was funded. Arthur immediately filed a motion objecting to "errors" in the trust agreement. While this motion was pending, the trustee, Mercantile National Bank of Indiana, applied for permission to invest the corpus and distribute the monthly $600. The court granted permission and also allowed the Bank to distribute $8,500 of principal so that Augusta could buy household furnishings. Arthur had notice of both motions.

The Superior Court denied Arthur's motion to correct errors in February 1978 with an order providing that if Arthur wished to file any additional papers—including a notice of appeal from the judgment that he had agreed could not be appealed—he had to post a bond for $5,000 to cover any fees and costs Augusta might incur in hiring counsel to resist. Arthur did not file the bond, appeal, or ask any higher court in Indiana to issue a prerogative writ.

The trust agreement approved by the commissioner on Arthur's behalf in 1977 permitted the trustee to pay Augusta's medical and burial expenses. She died in Florida in August 1985. The Bank asked the Superior Court for permission to disburse all of the money in the trust, about $40,000, to pay Augusta's medical and burial expenses. This motion was accompanied by correspondence from Arthur's current lawyer, showing that Arthur was no more reconciled to the trust in 1985 than in 1977; an undisputed affidavit states that despite knowing the address of both Arthur (the holder of the reversionary interest) and Arthur's lawyer, the Bank did not serve copies of its motion on them.

Within a month of learning that his reversionary interest was worthless, Arthur filed this suit in federal court in Chicago against the Bank, its parent corporation (Mercantile Bancorp, Inc.), Harry F. Smiddy, Jr. (an officer of the Bank), and John Widmar, Augusta's husband at the time of her death. Arthur never served Smiddy, so the district court dismissed him from the suit; we discuss him no further. The district court also dismissed Mercantile Bancorp, the holding company; Arthur's brief on appeal does not discuss the propriety of his attempt to "pierce the corporate veil," and there is no apparent basis for doing so. The claim against the holding company therefore has been abandoned, leaving only the Bank and Widmar as interested parties. We shall return to the question how a domiciliary of Texas can litigate in Illinois against an Indiana bank and a domiciliary of Florida on account of events in Indiana and Florida.

The complaint, which by accretion has grown to five counts, charges the Bank with fraud in the establishment and operation of the trust in 1977 and 1978; it charges both the Bank and Widmar with substantive and conspiratorial violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–65. The RICO claims are based on federal law and invoke federal-question jurisdiction; the fraud claim is based on state law and supported by diversity of citizenship (as well as pendent jurisdiction).

■ We can terminate with dispatch the claims against the Bank—no matter their legal theory—arising out of the establishment and early operation of the trust. They are barred, as the district court held, by claim preclusion, a branch of res judicata. Arthur litigated and lost in 1976–78 all

dispositive questions about the establishment, terms, and administration of the trust. He agreed to accept the decision of the Superior Court; nevertheless he litigated and lost a motion to "correct errors"; he resisted the Bank's applications to pay money out of the trust and lost. No method of attacking the creation and operation of the trust survives. True, the Bank as trustee was not technically a party to the proceedings creating the trust (though it was a party to the proceedings approving its administration of the trust), and Indiana still requires mutuality of estoppel, but the Bank was in privity with both Arthur and Augusta. It inherited Augusta's defenses. A court of Indiana would not entertain the contentions Arthur presses, to the extent he wants review of the establishment and early administration of the trust. See *Town of Flora v. Indiana Service Corp.*, 222 Ind. 253, 53 N.E.2d 161 (1944); *Jones v. American Family Mutual Insurance Co.*, 489 N.E.2d 160 (Ind.App.1986). A federal court, required by 28 U.S.C. § 1738 to give the judgments the same force they would have in Indiana, see *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985); *Harris Trust and Savings Bank v. Ellis*, 810 F.2d 700 (7th Cir.1987), may not entertain Arthur's effort to reopen what was settled in the 1970s.

Preclusion applies only if the party to be bound had a full and fair opportunity to litigate, and Arthur insists that he did not: the Superior Court required the posting of a bond. This effort to sidestep the effects of the judgments fails for two reasons. First, Arthur never used the remedies available to him in Indiana, such as a petition for mandamus, that might have eliminated the bond requirement. Having bypassed his remedies, Arthur may not start up seven years later in a different system of courts. E.g., *Harris Trust*, 810 F.2d at 705–06; cf. *Graham v. Schreifer*, 467 N.E.2d 800 (Ind.App.1984) (observing that a party may return to the rendering court to attack a judgment improperly obtained).

Second, there is nothing wrong with requiring a party to post a bond to cover costs. Whatever problems a penalty bond may create, see *Lindsey v. Normet*, 405 U.S. 56, 74–79, 92 S.Ct. 862, 874–77, 31 L.Ed.2d 36 (1971), a subject the Supreme Court may revisit in *Crenshaw v. Bankers Life & Casualty Co.*, 483 So.2d 254 (Miss. 1986), prob. juris. noted, —— U.S. ——, 107 S.Ct. 1367, 94 L.Ed.2d 683 (1987), a bond to secure the payment of costs creates none. See *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 547–55, 69 S.Ct. 1221, 1226–29, 93 L.Ed. 1528 (1949). Indiana allows courts to require losing litigants in divorce cases to pay their former spouse's attorneys' fees. Ind. Code § 31–1–11.5–16. A state that elects to shift the costs of litigation also may require a solvent litigant such as Arthur to make an earnest of payment. See *DeLong v. DeLong*, 161 Ind. App. 275, 289–91, 315 N.E.2d 412, 421–22 (1974). (Arthur does not contend that fee shifting is unconstitutional as a price on access to the courts, and could not plausibly do so. *Premier Electrical Construction Co. v. National Electrical Contractors Ass'n, Inc.*, 814 F.2d 358, 373–74 (7th Cir.1987); *Coleman v. CIR*, 791 F.2d 68, 71–72 (7th Cir.1986).) Arthur has not been a shy litigant, and the Superior Court may have suspected (based on Arthur's attitude about the 1974 judgment) that any subsequent fee-shifting order would be hard to enforce. The bond did not deprive Arthur of any entitlement to litigate, and the decisions of 1977 and 1978 are entitled to full preclusive effect.

■ It is not so easy, however, to mop up Arthur's contention that Widmar and the Bank defrauded him in administering the trust after 1978. Arthur apparently contests applications to, and payments by, the trust in the 1980s. To the extent these grow out of the decision of 1977, the claims are foreclosed. So, for example, Arthur's contention that the Bank could not pay Augusta's medical expenses because the trust should not have contained Article III ¶ 9, which permitted the money to be used in this way, is barred by issue preclusion. But to the extent Arthur contends that the Bank has been a faithless fiduciary—and that Widmar has submitted false claims— the record does not support the district

court's grant of summary judgment. Arthur and his current lawyer filed uncontroverted affidavits stating that they did not receive notice of the Bank's application for approval of the final disbursal and the dissolution of the trust in 1985. A decision to grant an ex parte application by a (supposedly) misbehaving trustee cannot bind Arthur, yet for all we can tell Arthur has had neither notice of nor opportunity to contest in Indiana anything the Bank has done since 1978. As settlor with a reversionary interest, Arthur had a property right in the corpus of the trust. *Hinds v. McNair*, 413 N.E.2d 586, 597–99 (Ind.App.1980). The grant of summary judgment in the Bank's favor on grounds of issue preclusion therefore must be vacated, to the extent Arthur presents claims of maladministration after the date of the last hearing in Indiana of which he had notice.

We cannot stop here, however, because the district court dismissed the suit against Widmar on a different ground: lack of jurisdiction over the person. Widmar lives in Florida and had no dealings with Illinois, the state in which the federal court sits. Arthur invoked 18 U.S.C. § 1965(b), which provides:

> In any action under [civil RICO] in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

The district court both declared that "section 1965 only addresses venue issues, not personal jurisdiction" and stated that if § 1965(b) creates personal jurisdiction it "would be unconstitutional" because "a party may never be hailed [sic] before a forum with which he does not have even the minimum contacts required to satisfy Due Process." Neither proposition is tenable.

■ Section 1965(a) deals with venue in RICO cases, but § 1965(b) creates personal jurisdiction by authorizing service. Service

of process is how a court gets jurisdiction over the person. See *Butcher's Union v. SDC Investment, Inc.*, 788 F.2d 535, 538–39 (9th Cir.1986) (treating § 1965(b) as addressing personal jurisdiction). Service may be ineffectual if the Constitution makes it so, but there is no constitutional obstacle to nationwide service of process in the federal courts in federal-question cases. The "minimum contacts" cases such as *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984), and *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), require only sufficient contacts between the defendant (or the defendant's transactions) and the forum. The question is whether the polity, whose power the court wields, possesses a legitimate claim to exercise force over the defendant. A state court may lack such an entitlement to coerce, when the defendant has transacted no business within the state and has not otherwise taken advantage of that sovereign's protection. A federal court sitting in a diversity case generally may issue process only within the territory a state court could, see Fed.R.Civ.P. 4; limitations on the power of the state therefore carry over to diversity litigation. A federal court in a federal question case is not implementing any state's policy; it exercises the power of the United States. And there can be no doubt that the national government is entitled to sanction Mr. Widmar for civil wrongs committed within the territory of the United States. Widmar may not demand that the court applying the law of the United States be conveniently located.

This approach to personal jurisdiction in federal courts has been established since 1878, when the Supreme Court rejected the very argument that the district court accepted. *United States v. Union Pacific R.R.*, 98 U.S. (8 Otto) 569, 603–04, 25 L.Ed. 143 (1878), holds that Congress may make a court in Washington, D.C., the exclusive forum for certain claims arising under federal law. We applied that holding in *Fitzsimmons v. Barton*, 589 F.2d 330, 332–34 (7th Cir.1979), concluding that a provision

in the Securities Exchange Act of 1934 similar to § 1965(b) not only creates personal jurisdiction over anyone within the United States but also is consistent with the Due Process Clause of the fifth amendment. See also, e.g., *SIPC v. Vigman*, 764 F.2d 1309, 1315 (9th Cir.1985); *Mariash v. Morrill*, 496 F.2d 1138, 1143 (2d Cir.1974). Congress establishes the district courts' personal jurisdiction. *Point Landing, Inc. v. Omni Capital International, Ltd.*, 795 F.2d 415, 422–27 (5th Cir.1986) (en banc), cert. granted under the name *Omni Capital International v. Rudolf Wolff & Co.*, — U.S. ——, 107 S.Ct. 946, 93 L.Ed.2d 995 (1987), presents the question whether the omission from the commodities laws of a provision like § 1965(b) confines federal courts to the process that can be served under Rule 4. RICO contains an explicit grant of nationwide service, however, and the Due Process Clause does not upset Congress's decision.

Although this case must be returned to the district court, it will not necessarily linger on the docket. It is hard to see how venue could be laid in Illinois. Any wrongs occurred in Indiana and Florida; the Bank is a national bank "located" in Indiana (see 28 U.S.C. § 1348), and Widmar is a citizen of Florida. As a rule, "[a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by law." 28 U.S.C. § 1391(b). RICO, which "otherwise provide[s]", permits venue to be laid in "any district in which such [defendant] resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a). The claim did not arise in Illinois; neither the Bank nor Widmar resides or can be found in Illinois; although the complaint alleges that the Bank transacts affairs in Illinois, Arthur will be hard pressed to prove this given the constraints on interstate banking. Even if the Bank transacts affairs in Illinois, Arthur still must show that "the interests of justice require" (18 U.S.C. § 1965(b)) that Widmar be haled into that court. Section 1965(b) authorizes nationwide service so that at least one court will have jurisdiction over everyone connected with any RICO enterprise. A district court in Indiana will have that jurisdiction whether or not Widmar can be brought before the court in Illinois, so perhaps the ends of justice do not "require" his presence in this suit.

The complaint also is sketchy about what frauds Widmar and the Bank perpetrated after 1978, so sketchy that the complaint is unlikely to survive scrutiny under Fed.R. Civ.P. 9(b). See *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 818 (7th Cir.1987). On top of that, Arthur's lawyer appears to believe that any two mailings create the necessary "pattern" of racketeering under RICO. Not so. *Ibid.*; and see, e.g., *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1303–04 (7th Cir.1987), and *Appley v. West*, 832 F.2d 1021, 1027–28 (7th Cir.1987), this court's most recent efforts to define a "pattern". The only claims that we can discern, other than those dealing with events in the 1970s, have to do with Augusta's medical expenses, which do not look like a pattern. There may be additional problems; these are only the most apparent. The emptiness of the suit against Smiddy and the holding company, the origin of this dispute in a matrimonial grudge, the ferocity of the allegations of fraud coupled with the lack of specifics, and the high ratio of certitude to citation, suggest that this is the sort of litigation in which the district court should give special attention to Fed.R.Civ.P. 11. We trust that on remand the district court will give the existing and future filings a close look and inquire into the adequacy of the pre-filing investigation conducted by Arthur's lawyer. See *Brown v. Federation of State Medical Boards*, 830 F.2d 1429 (7th Cir. 1987); *Szabo Food Service, Inc. v. Canteen Corp.*, 823 F.2d 1073, 1082–84 (7th Cir.1987).

The judgment is affirmed to the extent it dismisses the suit against Smiddy and Mercantile Bancorp, and to the extent it grants summary judgment on claims that have been the subject of decisions of the Indiana judiciary of which plaintiff received notice.

The judgment otherwise is vacated, and the case is remanded for further proceedings consistent with this opinion. Circuit Rule 36 shall not apply on remand. No costs.